IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

AMY J. JOHNSON,

     Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

     Defendant.

No. C12-2066

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II. PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III. PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*IV. FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   *A. Johnson's Education and Employment Background* . . . . . . . . . . . . . . 5
   *B. Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *1. Johnson's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *2. Vocational Expert Testimony* . . . . . . . . . . . . . . . . . . . . . . . 8
   *C. Johnson's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*V. CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   *A. ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   *B. Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      *1. Opinions of Dr. Steinkraus and Dr. Fealey* . . . . . . . . . . . . 19

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

2.  *Opinions of Non-Examining Medical Consultants* . . . . . . . 22
3.  *Credibility Determination* . . . . . . . . . . . . . . . . . . . . . . . 24
C. *Reversal or Remand* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VI. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VII. *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

### I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Amy J. Johnson on September 13, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Johnson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Johnson requests the Court to remand this matter for further proceedings.

### II.  PROCEDURAL BACKGROUND

On October 26, 2009, Johnson applied for disability insurance benefits, and on November 5, 2009, she applied for SSI benefits. In her applications, Johnson alleged an inability to work since August 12, 2009 due to fibromyalgia, migraine headaches, postural orthostatic tachycardia syndrome ("POTS"),[2] chronic fatigue syndrome, irritable bowel syndrome, and GERD (gastroesophageal reflux disease). Johnson's applications were denied on December 24, 2009. On April 22, 2010, her applications were denied on reconsideration. On July 8, 2010, Johnson requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 13, 2011, Johnson appeared via video

---

[2] POTS is a medical condition in which changing from a supine position to an upright position causes an abnormally large increase in heart rate.

2

conference with her attorney before ALJ David G. Buell for an administrative hearing. Johnson and vocational expert Vanessa May testified at the hearing. In a decision dated November 23, 2011, the ALJ denied Johnson's claims. The ALJ determined that Johnson was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing her past relevant work as a residence counselor. Johnson appealed the ALJ's decision. On July 19, 2012, the Appeals Council denied Johnson's request for review. Consequently, the ALJ's November 23, 2011 decision was adopted as the Commissioner's final decision.

On September 13, 2012, Johnson filed this action for judicial review. The Commissioner filed an Answer on December 19, 2012. On January 22, 2013, Johnson filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing her past relevant work as a residence counselor. On March 18, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On October 16, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing."

3

42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial

4

of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Johnson's Education and Employment Background

Johnson was born in 1980. She earned a BSN in nursing. Her past work includes being a residence counselor and a nurse. The record contains a detailed earnings report for Johnson. The report covers the time period of 1998 to 2010. According to the report, from 1998 to 2009, Johnson earned between $1,182.85 (1998) and $39,758.86 (2008). She earned $30,131.73 in 2009. She has no earnings since 2010.

### B. Administrative Hearing Testimony

#### 1. Johnson's Testimony

At the administrative hearing, the ALJ inquired what occurred on August 12, 2009, Johnson's alleged disability onset date, that made Johnson believe she could no longer work full-time employment. Johnson explained that:

5

| | |
|---|---|
| A: | Well, [it] all kind of led up to it, in about February '09, I was unable to work on the floor anymore. My boss was afraid of coding me after I would code a patient. |
| ATTY: | Well, tell him [(the ALJ)] what that means. |
| CLMT: | Sorry, coding is when your heart stops and you have to bring the heart back, so I -- my POTS was acting, was, you know, acting up and I would get tachycardic. My heart would go extremely fast and I would almost pass out. I'd be able to stop myself before I passed out, but I was unable to work on the floor at that point. So I started working in the research data nursing, which is the Return to Work Program, where you just enter data into the computer for research purposes up at Mayo. |
| ALJ: | Okay. Did you . . . do this data entry for a full-time basis, then for a time or -- |
| A: | Yes. Yeah, according to . . . my occupational health doctor, according to his outlines I had to follow, which started off only working eight-hour shifts, no night shifts during the day to help regulate my system a little bit, and then being in front of the computer and sitting made my POTS get worse, because I was sitting too long. So then he had to, you know, put the -- I would have to go take a little walk or stand and do a mixture of that. So we tried that. And then my migraines also increased, to the point where I'd get, they call them flying spells. They diagnose it as subjective dizziness migraines. So I can't sit and look at a computer screen for -- everything affects each other -- |
| Q: | Yes. |
| A: | -- so, by the time August came, I was to the point where I couldn't drive anymore. I about crashed the car a couple times because of the dizzy migraines. I was up to the point where I |

6

|       | could only drive about 20 minutes. Still currently at that point. And I was just so fatigued, I couldn't keep my eyes open. My pain was increasing uncontrollably and it's just my body was starting to almost shut down. |
|-------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Q:    | Okay. So that was --                                                                                                                                                                                                       |
| A:    | So I --                                                                                                                                                                                                                    |
| Q:    | -- August of '09 was kind of when this you felt came, became severe enough or widespread enough that you just really couldn't even continue even with the Return to Work Program that you described?                      |
| A:    | Yes.                                                                                                                                                                                                                       |

(Administrative Record at 40-41.) The ALJ continued questioning Johnson and asked her what the biggest obstacle would be to performing "a full-time job where you just sat and did something repetitive and easy."[3] Johnson replied that she would have difficulty getting ready for work in a timely fashion, and would also have difficulty physically getting to work because she is unable to drive due to her health conditions. Johnson also testified that she would have trouble performing full-time work at a consistent pace due to her various health conditions.

Johnson's attorney also questioned Johnson. First, Johnson's attorney asked Johnson to describe her levels of pain. Johnson stated that her pain level averaged 8 to 10 on a 10 point scale with 10 being the most severe pain. However, using techniques she learned from a pain clinic, Johnson testified that she could get her pain level down to about a 6, making it manageable. Johnson also stated that she is unable to use most pain medications because they affect her other health conditions. According to Johnson, she also frequently alternates positions from sitting to standing to help alleviate her pain.

_____

[3] Administrative Record at 42.

Next, Johnson's attorney inquired whether any progress had been made in her multiple heath conditions. Johnson responded:

> Oh, no, because I cannot take any medications. My body metabolizes medications differently, they think, so I can't take any medications for my migraine . . . I still can't do anything that would trigger them. But my fibromyalgia, I can't really take medications for unless I take that tramadol every once in a while. Otherwise, I just have to deal with it. The POTS, I can't take medications. They lower my heart rate and increase my blood pressure because of the side effects. I, I can't take medications for anything, really.
>
> So, there is nothing that they can really do anymore. My doctor put me on permanent Disability as in she thinks that there will be no getting better from here on out unless they find a cure, which they have to figure out what it is first.

(Administrative Record at 54.) Lastly, Johnson's attorney asked Johnson how many days of work she would miss in one month due to her health problems. Johnson estimated that she would miss about 10 days per month dealing with health related issues.

### 2. *Vocational Expert Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is limited to:

> 20 pounds lifting occasionally, 10 pounds frequently lifting, but a maximum of two hours on her feet during an eight-hour workday and can sit for six hours . . . [and] a limit that she could not be exposed to any unprotected hazards or -- such as unprotected heights or dangerous, moving machinery[.]

(Administrative Record at 61.) The vocational expert testified that under such limitations, Johnson could perform her past relevant work as a residence counselor. The ALJ provided the vocational expert with a second hypothetical that was identical to the first hypothetical except that the individual "cannot use a computer screen, cannot work either with a

8

computer screen or a television screen . . . and . . . the individual . . . might need to leave the workplace . . . one time per work shift to use the restroom and [would] be absent . . . for . . . five minutes[.]"[4] The vocational expert testified that with such additional limitations, Johnson would still be able to perform her past work as a residence counselor. Finally, the ALJ asked of the vocational expert:

> [I]f an individual, due to fatigue, is unable to perform even very simple tasks such as brushing one's teeth, that is to say they're -- due to extreme fatigue, they can't really perform any task, regardless of how light the weight is, they really just can't even move their arms and their legs and stand up long enough to persist at them for more than a couple minutes at a time, I'm assuming such an individual wouldn't be competitively employable, is that right?

(Administrative Record at 64.) The vocational expert responded that the ALJ was correct, an individual with such limitations would be precluded from competitive employment.

Johnson's attorney also questioned the vocational expert. Specifically, Johnson's attorney inquired:

> Q: If the hypothetical person needed to work at a slow pace up to a third of the workday, would they be competitively employable?
>
> A: No.
>
> Q: If the hypothetical person needed more than normal rest breaks, two to three, four at a time of unequal times, in other words, 15 minutes one time, 30 minutes the next, at various times during the workday, in addition to the normal work breaks, would an employer allow for that much extra work off?
>
> A: Not generally speaking. They would definitely have their productivity affected at some point-in-time.
>
> Q: Okay. If the hypothetical person needed to miss work two to three to four and as [Johnson] testified, at least

---

[4] Administrative Record at 63.

>
> 15 days a month, I'm assuming that all employment
> would be eliminated?
>
> A:    Yes.

(Administrative Record at 65.)

### C.  Johnson's Medical History

On September 1, 2009, Johnson was referred to Mayo Clinic's Fibromyalgia and Chronic Fatigue Clinic for evaluation of chronic pain, musculoskeletal pain, problems with sleep, and fatigue. Johnson reported sharp, aching, burning, numbing, and tingling pain in her extremities, burning pain in her hips, sharp pain in her lower back, and achiness in other areas of her body. She indicated that her pain is aggravated by overexertion, physical activity, repetitive motion, prolonged sitting, prolonged standing, driving, stairs, and poor sleep. She rated her pain as anywhere from a 3 to a 10 on a scale of 1 to 10 with 10 being the most severe pain. Johnson also reported suffering from moderate fatigue. She described her fatigue as "an occasional feeling of being tired or exhausted, not improved by rest, [and] lasts more than 50% of the time."[5] Upon examination, Johnson was diagnosed with chronic pain and fatigue. It was determined that she would be a good candidate for pain rehabilitation services at the Mayo Clinic.

On November 10, 2009, Johnson met with Dr. Lawrence W. Steinkraus, M.D., for a work status evaluation. In reviewing her medical history, Dr. Steinkraus noted the following:

> Johnson is a . . . nurse who has worked at Mayo and is
> currently off work due to several chronic medical conditions.
> The primary diagnosis of interest is fibromyalgia which is
> related to other illnesses that she is dealing with.  The
> fibromyalgia has been impairing her ability to due [sic] normal
> work both through the pain but also through the medications
> required to control the pain.  Specifically, she has been using

---

[5] Administrative Record at 379.

OxyContin and Oxycodone on a scheduled basis and is [*sic*]
now been diagnosed as being opioid dependent. Plan is to
admit her to the hospital, possibly today, for withdrawal
management. . . . [Johnson] also has a diagnosis of POTS
which produces hypertension and difficulty maintaining fluid
status. She also has a history of chronic migraines coming in
two versions, one a recurrent headache and the other more of
a dizziness syndrome which is daily. . . . She does have a
significant amount of fatigue, but because of the diagnosis of
fibromyalgia she does not meet formal criteria for chronic
fatigue syndrome; although her physicians are calling this a
chronic fatigue problem. . . . She stays on her couch probably
seven out of eight hours and is not able to tolerate sitting up
based on the dizziness and fatigue.

(Administrative Record at 333.) Upon examination, Dr. Steinkraus concluded that
Johnson was "quite impaired at this point and is unable to work at any capacity
currently."[6] Dr. Steinkraus based his conclusion on Johnson's diagnoses of fibromyalgia,
chronic pain, and chronic fatigue. Dr. Steinkraus ordered Johnson off work until at least
January 8, 2010. Dr. Steinkraus recommended entering Mayo Clinic's Pain Rehabilitation
Program as treatment.

On December 21, 2009, Dr. Philip Laughlin, Ph.D., reviewed Johnson's medical
records and provided Disability Determination Services ("DDS") with a Psychiatric
Review Technique assessment for Johnson. Dr. Laughlin diagnosed Johnson with mild
depression and detoxification from Oxycodone. Dr. Laughlin determined that Johnson had
the following limitations: mild restriction of activities of daily living, mild difficulties in
maintaining social functioning, and mild difficulties in maintaining concentration,
persistence, or pace. Dr. Laughlin opined:

[Activities of daily living] restrictions do not appear related to
any mental impairment. [Johnson] is receiving no mental

---

[6] Administrative Record at 334.

> health treatment from any provider and, instead, has focused on the need for multidisciplinary rehabilitation for the conditions related to her physical allegations and related pain symptoms.

(Administrative Record at 547.)

On December 23, 2009, Dr. Donald Shumate, D.O., reviewed Johnson's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Johnson. Dr. Shumate determined that Johnson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of at least two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Shumate also found that Johnson could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. Dr. Shumate further opined that Johnson should avoid concentrated exposure to hazards, such as machinery and heights. Dr. Shumate found no manipulative, visual, or communicative limitations. Dr. Shumate concluded that while Johnson has multiple medically determinable impairments, "[t]he preponderance of medical evidence indicates [she] is capable of activity as noted in the RFC."[7]

On February 15, 2010, Johnson met with Dr. Steinkraus for a follow-up work status evaluation. Dr. Steinkraus noted that at the time of her visit, Johnson continued to be off work due to her "chronic medical conditions." Johnson completed pain rehabilitation and informed Dr. Steinkraus that it was "quite helpful." Dr. Steinkraus indicated that Johnson:

> noticed increased energy, improved fluid status with less edema, improved attitude and mood, and decreased awareness of pain symptoms. She does note that she still has pain, both headaches and general, with the fibromyalgia, but she feels she

---

[7] Administrative Record at 556.

> can handle this better now with the information and training
> she has received.

(Administrative Record at 596.)   Upon examination, Dr. Steinkraus concluded that Johnson was ready for a trial of work.  Dr. Steinkraus recommended the following for a trial of work:  (1) start by working four-hour shifts every other day; (2) take 15-minute breaks every two hours in addition to meal breaks; (3) stretch and hydrate as needed; and (4) sit a maximum of 30 minutes followed by stand/walk mixture and a maximum of sitting two hours per shift.

On April 22, 2010, Dr. Rene Staudacher, D.O., reviewed Johnson's medical records and provided DDS with a physical RFC assessment for Johnson.  Dr. Staudacher determined that Johnson could:  (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of at least two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations.  Dr. Staudacher also found that Johnson could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds.  Dr. Staudacher further opined that Johnson should avoid concentrated exposure to hazards, such as machinery and heights.   Dr. Staudacher found no manipulative, visual, or communicative limitations.

Johnson, however, was unable to start the recommended trial of work due to hormonal problems causing severe pelvic pain, and requiring a hysterectomy.[8]  On May 24, 2010, Johnson returned to Dr. Steinkraus for a follow-up work status evaluation.  At the time of the evaluation, Johnson had not worked since the summer of 2009.  Dr. Steinkraus noted that since her last visit in March 2010, Johnson had undergone a

---

[8] *See* Administrative Record at 726.

hysterectomy and began having severe pain symptoms in her thighs, hips, and lower back. Dr. Steinkraus also noted that Johnson was having sleeping difficulties due to pain. Upon examination, Dr. Steinkraus concluded that Johnson "continues to be impaired due to multiple medical issues and is not ready to go back to work."[9] On August 11, 2010, Johnson had another follow-up appointment with Dr. Steinkraus for a work status evaluation. Upon examination, Dr. Steinkraus concluded that:

> Unfortunately, [Johnson] continues to be impaired by multiple issues and is not ready to go back to work. We were hoping that she would have some improvement post surgery and with the chronic pain issues addressed, but this has not occurred yet. . . . We had a long discussion with regard to potential for permanent restrictions based on the long-term nature of her problems. As she still has some evaluation coming up with her various physicians, I do not think we can close the book on this yet.

(Administrative Record at 752.) Johnson returned to Dr. Steinkraus for another follow-up work status evaluation on November 23, 2010. Upon examination, Dr. Steinkraus determined that:

> Mrs. Johnson has been through extensive evaluations here at Mayo with various subspecialists. Multiple attempts have been made to try to address the impairments due to her medical conditions so that she can return to work, none of which have been successful. Due to the multiple somatic issues related to her various conditions, it does not appear that we have any options at this time for returning her to the workplace with reasonable accommodations or a restriction pattern. As such, I concur with Dr. York that at this time [Johnson] appears to be unable to work and that at this time we are going to proceed with making this a permanent restriction based on the extent of time, the level of workup, and the poor or guarded prognosis from her various subspecialists.

---

[9] *Id.* at 743.

(Administrative Record at 862.)

On May 17, 2011, Johnson met with her primary care physician, Dr. Elaine B. York, M.D. Upon examination, Dr. York diagnosed Johnson with permanent disability secondary to chronic pain and fibromyalgia, exacerbated by POTS. Dr. York determined that Johnson should continue on permanent disability. Dr. York opined that Johnson "has been unable to work because of exacerbations of both of these diseases, and I see no reason to believe that she will be cured, but will be managing the best [she can]. I feel that [Johnson] has completed all necessary evaluation as well."[10]

On July 13, 2011, Johnson met with Dr. Robert D. Fealey, M.D., regarding her difficulties with orthostatic intolerance. Dr. Fealey noted that:

> [Johnson] is a highly complex individual with multiple issues, particularly in the last two years, which have produced a lot of consignation among her and her caregivers as to exactly what is going on. I have seen her a number of times in the past, and although she does not satisfy criteria for POTS, she has an orthostatic intolerance syndrome, which is clearly postural in nature and is benefitted by the horizontal position or the hydrostatic pressure of being in the swimming pool and benefitted from salt and fluid intake.

(Administrative Record at 1011.) Upon examination, Dr. Fealey diagnosed Johnson with chronic orthostatic intolerance, deconditioning, chronic fatigue and fibromyalgia, and chronic sleep apnea. Dr. Fealey prescribed an abdominal binder and compression stockings as treatment when Johnson sits upright.

In January 2012, Dr. York provided Johnson's attorney with a letter discussing Johnson's medically based impairments. Dr. York noted that she first saw Johnson in April 2009, complaining of hip, back, and neck pain. She was eventually diagnosed with

---

[10] Administrative Record at 1001.

15

fibromyalgia, which was confirmed by Mayo's Fibromyalgia Clinic and Dr. Floranne Ernste, a rheumatologist. Dr. York opined:

> Mrs. Johnson's pain has been addressed with all available avenues to control it. It has not been reduced to an effective level to allow her to work. She is unable, due to a condition that she has called hemophilia, to take nonsteroidal medications and Lyrica which may lower her platelet cells and contribute to bleeding. The chronic pain medication, Cymbalta, was not attempted due to her having suicidal thoughts previously on similar selective serotonin [] inhibitor medications. She could not tolerate mintriptyline or nortriptyline. Gabapentin, another common medication used for chronic pain, did not help her. . . .

> Aside from pain medications, she has been evaluated with physical therapy and the Pain Management Clinic. Dr. Lawrence Steinkraus concurred with me that after extensive evaluations and attempts at having [Johnson] be able to return to work, these efforts have been unsuccessful.

(Administrative Record at 1049.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Johnson is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the

16

> impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful
> activity. If so, the claimant is not disabled. Second, the ALJ
> determines whether the claimant has a severe medical
> impairment that has lasted, or is expected to last, at least
> 12 months. Third, the ALJ considers the severity of the
> impairment, specifically whether it meets or equals one of the
> listed impairments. If the ALJ finds a severe impairment that
> meets the duration requirement, and meets or equals a listed
> impairment, then the claimant is disabled. However, the
> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a

17

significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Johnson had not engaged in substantial gainful activity since August 12, 2009. At the second step, the ALJ concluded from the medical evidence that Johnson had the following severe impairments: fibromyalgia, postural orthostatic tachycardia syndrome (POTS), status post hysterectomy, migraines, and obesity. At the third step, the ALJ found that Johnson did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Johnson's RFC as follows:

> [Johnson] has the residual functional capacity to perform sedentary work . . . except that she can lift and carry 20 pounds occasionally and ten pounds frequently. She can stand a maximum of two hours on her feet in an eight-hour workday. She can sit six hours in an eight-hour workday. She must limit her exposure to any unprotected hazards such as unprotected heights and dangerous and moving machinery. She would require an additional break in the morning and afternoon of five minutes duration as well as the typical 15-minute break twice each workday.

(Administrative Record at 15.) Also at the fourth step, the ALJ determined that Johnson was capable of performing her past relevant work as a residence counselor. Therefore, the ALJ concluded that Johnson was not disabled.

18

### B. Objections Raised By Claimant

Johnson argues that the ALJ erred in three respects. First, Johnson argues that the ALJ failed to properly consider the opinions of her treating physicians, Dr. Steinkraus and Dr. Fealey. Second, Johnson argues that the ALJ failed to properly consider the opinions of the non-examining state agency consultants. Finally, Johnson argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability.

### 1. Opinions of Dr. Steinkraus and Dr. Fealey

Johnson argues that the ALJ failed to properly evaluate the opinions of Dr. Steinkraus and Dr. Fealey. Specifically, Johnson argues that the ALJ failed to consider or even weigh either the opinion of Dr. Steinkraus, or the opinion of Dr. Fealey. Johnson further argues that the ALJ also failed to offer any reasons for accepting or rejecting the opinions of Dr. Steinkraus and Dr. Fealey. Johnson concludes that this matter should be remanded so that the ALJ can fully and fairly develop the record and properly consider the opinions of Dr. Steinkraus and Dr. Fealey.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v.*

*Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)). "There is no bright line rule indicating when the Commissioner has or has not adequately

developed the record; rather, such an assessment is made on a case-by-case basis."
*Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In his decision, the ALJ offers no discussion of the opinions of Dr. Steinkraus or Dr. Fealey. In fact, the ALJ offers no discussion of any opinions from any doctors. This is particularly surprising to the Court considering that the record consists of 781 pages of medical records containing a plethora of opinions from a variety of doctors.[11] Moreover, Dr. Steinkraus and Dr. Fealey were treating doctors who met with Johnson on multiple occasions. For example, most recently, on July 13, 2011, Dr. Fealey opined that:

> [Johnson] is a highly complex individual with multiple issues, particularly in the last two years, which have produced a lot of consignation among her and her caregivers as to exactly what is going on. I have seen her a number of times in the past, and although she does not satisfy criteria for POTS, she has an orthostatic intolerance syndrome, which is clearly postural in nature and is benefitted by the horizontal position or the hydrostatic pressure of being in the swimming pool and benefitted from salt and fluid intake.

(Administrative Record at 1011.) Upon examination, Dr. Fealey diagnosed Johnson with chronic orthostatic intolerance, deconditioning, chronic fatigue and fibromyalgia, and chronic sleep apnea. Similarly, on November 23, 2010, Dr. Steinkraus determined that:

> Mrs. Johnson has been through extensive evaluations here at mayo with various subspecialists. Multiple attempts have been made to try to address the impairments due to her medical conditions so that she can return to work, none of which have been successful. Due to the multiple somatic issues related to her various conditions, it does not appear that we have any options at this time for returning her to the workplace with reasonable accommodations or a restriction pattern. As such, I concur with Dr. York that at this time [Johnson] appears to

---

[11] *See* Administrative Record at 268-1049 (the portion of the record devoted to Johnson's medical records and history).

21

> be unable to work and that at this time we are going to proceed
> with making this a permanent restriction based on the extent of
> time, the level of workup, and the poor or guarded prognosis
> from her various subspecialists.

(Administrative Record at 862.) The ALJ fails to address either of these opinions, or any other opinion expressed by Dr. Steinkraus and Dr. Fealey in his decision.

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). The Court finds that the ALJ has not fully met these requirements. Here, the ALJ has failed to give any reasons, let alone good reasons, for accepting, rejecting, or even weighing the opinions of Dr. Steinkraus or Dr. Fealey. Moreover, by failing to even address Dr. Steinkraus' and Dr. Fealey's opinions, the ALJ has failed in his duty to fully and fairly develop the record in this case. Therefore, the Court finds that this matter should be remanded so that the ALJ may fully and fairly develop the record with regard to both Dr. Steinkraus' and Dr. Fealey's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting the opinions of both Dr. Steinkraus and Dr. Fealey and support his reasons with evidence from the record.

### 2. *Opinions of Non-Examining Medical Consultants*

Johnson argues that the ALJ failed to fully and properly evaluate the opinions of Dr. Staudacher, a non-examining state agency doctor. Specifically, Johnson maintains that the ALJ erred in relying on Dr. Staudacher's opinions to support his RFC assessment for her because Dr. Staudacher's opinions were based on the assumption that her medical

condition would improve, and it did not improve. As a result, Johnson contends that the ALJ's RFC assessment is not supported by substantial evidence in the record as a whole.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(d)). An ALJ is also required to "'explain in the decision the weight given to the opinions of a State agency medical . . . consultant[.]'" *Wilcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (quoting 20 C.F.R. § 404.1527(f)(2)(ii)).

An ALJ also has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser*, 545 F.3d at 639.

Furthermore, an ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*

23

*v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Here, like with Johnson's treating doctors, the ALJ offered no discussion of the opinions of any state agency consultative doctor. The ALJ simply stated that his RFC was consistent with "the opinion of the State agency medical consultants."[12] By failing to address the opinions of any doctors, consultative, treating, or otherwise, the Court finds that the ALJ failed in his duty to fully and fairly develop the record with regard to the opinions of the state agency doctors. *See Cox*, 495 F.3d at 618. Moreover, by not addressing any medical opinions when the record contains nearly 800 pages of medical records, the Court finds that the ALJ's RFC assessment lacks the requisite consideration of relevant evidence for determining a claimant's RFC. *See Lacroix*, 465 F.3d at 887 (providing that relevant evidence for making an RFC determination includes a claimant's medical records, the opinions of treating doctors, and the claimant's own description of his or her limitations). Accordingly, on remand, the ALJ must fully and fairly develop the record with regard to the opinions of the consultative doctors, especially as such opinions relate to Johnson's RFC. *See Cox*, 495 F.3d at 618.

### 3. *Credibility Determination*

Johnson argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability. Johnson maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Johnson's testimony, and properly evaluated the credibility of her subjective complaints.

---

[12] Administrative Record at 20.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb

25

the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In his decision, the ALJ determined that:

> [Johnson's] extreme and dramatic statements are completely unsupported by the record. Additionally, medical records indicated that [Johnson] had improvement in her POTS disease and has not experienced episodes of syncope or extreme fatigue. For example, she reported activities that she performed such as reading and playing video games with her son. She also takes her son to the playground and helps him with homework. . . .

> After careful consideration of the evidence, the undersigned finds that [Johnson's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

26

(Administrative Record at 17-18.) The ALJ also addressed a function report from November 17, 2009, in which Johnson outlines a variety of activities of daily living she is capable of performing, including child care and housework.[13]

It is clear that the ALJ considered the regulations, *Polaski* factors, and medical records in making his credibility determination.[14] What is less clear, and somewhat troubling to the Court, is whether the ALJ considered the entire record, including her vast medical history, and all the *Polaski* factors in addressing Johnson's subjective allegations of pain and disability. A review of the record demonstrates that Johnson has had many peaks and valleys in her treatment of fibromyalgia, chronic fatigue, POTS, and pain control. While it is true that her symptoms have improved at times with medication and exercise, it is also true that her symptoms have declined while using medication and exercise. The Court also has difficulty understanding the ALJ's finding that Johnson "had improvement in her POTS disease and has not experienced episodes of syncope or extreme fatigue" because there is evidence in the record that would likely support a finding of episodes of syncope and evidence that would not support a finding of extreme fatigue. For example, Dr. York, Johnson's treating physician and primary doctor, diagnosed Johnson with permanent disability secondary to chronic pain and fibromyalgia, exacerbated by POTS.[15] Furthermore, the Court finds that the ALJ's reliance on a November 2009 function report to show inconsistencies between Johnson's testimony and her medical records is misplaced. The 2009 report was written 3 months after Johnson alleges she became disabled. The record clearly demonstrates that Johnson's symptoms worsened in 2010 and 2011, to the point that two of her treating doctors opined that she is permanently

---

[13] *See* Administrative Record at 17-18 (ALJ's decision); 206-213 (function report).

[14] *Id.* at 16 (discussing regulations and *Polaski*).

[15] *Id.* at 999-1002.

27

disabled.[16] Moreover, as discussed in sections *V.B.1* and *V.B.2*, the ALJ failed to offer any discussion of the opinions of any of Johnson's treating or consultative doctors, even though the record contains nearly 800 pages of medical records. Thus, it is difficult for the Court to take seriously the ALJ's consideration of the medical evidence as it relates Johnson's credibility. In other words, the ALJ's generic and undetailed list of reasons for finding Johnson's statements "completely unsupported by the record," lacks the requisite detail for an informed review by this Court.

Therefore, the Court finds that the ALJ failed to set forth the requisite detailed reasons for discrediting Johnson's testimony, and fully explain the inconsistencies in the record. *See Ford*, 518 F.3d at 982 (providing that an ALJ must "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'") (quotation omitted); *Baker*, 159 F.3d at 1144 ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Accordingly, the Court finds that remand is appropriate for the ALJ to further develop the record with regard to Johnson's credibility. On remand, the ALJ shall set forth in detail his reasons for finding Johnson's subjective allegations to be credible or not credible. If on remand, the ALJ finds Johnson's testimony not to be credible, the ALJ is required to fully explain *in detail*, the reasons for his credibility determination and fully explain *in detail*, the inconsistencies between Johnson's subjective allegations and the evidence in the record.

---

[16] *See* Administrative Record at 862 (Dr. Steinkraus in November 2010); 1001 (Dr. York in May 2011); 1049 (Dr. York in January 2012).

## C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to: (1) fully and fairly develop the record with regard to the opinions of Johnson's treating physicians; (2) fully and fairly develop the record with regard to the opinions of the consultative doctors; and (3) properly consider Johnson's subjective allegations of pain and disability. Accordingly, the Court finds that remand is appropriate.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall provide clear reasons for accepting or rejecting the opinions Dr. Steinkraus and Dr. Fealey, and support his reasons with

evidence from the record. The ALJ must also fully and fairly develop the record with regard to the opinions of the state agency consultative doctors, especially as those opinions relate to Johnson's RFC assessment. Finally, the ALJ must also consider all of the evidence, including medical evidence and opinions of Johnson's treating physicians, relating to Johnson's subjective allegations of disability, address his reasons for crediting or discrediting those allegations, and properly apply the *Polaski* factors when determining Johnson's credibility.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this _18th_ day of July, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA